**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**January 2, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2019AP1133**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018ME49

**IN COURT OF APPEALS**
**DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF D. J.:

MONROE COUNTY,

　　PETITIONER-RESPONDENT,

　V.

D. J.,

　　RESPONDENT-APPELLANT.

　　　　　APPEAL from an order of the circuit court for Monroe County: MARK L. GOODMAN, Judge. *Affirmed*.

¶1    GRAHAM, J.[1] D.J. appeals an involuntary commitment order, which was entered by the circuit court in favor of Monroe County after a jury found that D.J. met the statutory criteria for commitment. D.J. contends that he was denied procedural due process, and further, that the evidence presented at trial was insufficient to prove that he was "dangerous" as defined in WIS. STAT. § 51.20(1)(a)2. I conclude that D.J. forfeited his due process argument by failing to timely raise it in the circuit court, and that the evidence presented at trial was sufficient. Accordingly, I affirm.

## BACKGROUND

¶2    D.J. has been diagnosed with schizoaffective disorder. On July 11, 2018, while he was receiving care at the Gunderson Lutheran Behavioral Health Clinic, he became involved in an altercation with clinic staff and made threatening statements about members of the clinic staff, members of his family, and the President of the United States. Clinic staff also discovered that D.J. made what appeared to be weapons from clothing filled with wet paper towels and other items. A Gunderson designee filed a statement of emergency detention pursuant to WIS. STAT. § 51.15, and D.J. was transferred to the Winnebago Mental Health Institute.

¶3    The statement of emergency detention commenced proceedings for D.J.'s involuntary commitment for mental health treatment pursuant to WIS. STAT. § 51.20. That statute allows a county to commit an individual if the county proves by clear and convincing evidence that the individual is mentally ill, a proper

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

2

subject for treatment, and "dangerous" as defined by at least one of five standards set forth in § 51.20(1)(a)2. For ease of reference, this opinion refers to the statutory standards of dangerousness at issue in this case as the "first standard,"[2] the "second standard,"[3] and the "fifth standard."[4]

¶4    At a probable cause hearing, the circuit court found probable cause to believe that D.J. was mentally ill, a proper subject for treatment, and "dangerous to self or others." The court did not further specify the standard of dangerousness that applied, nor did it check a box on the form order indicating that there was probable cause that D.J. was dangerous under the fifth standard.

---

[2] The "first standard," which pertains to dangerousness to self, requires proof that the individual "[e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." WIS. STAT. § 51.20(1)(a)2.a.

[3] The "second standard," which pertains to dangerousness to others, requires proof that the individual "[e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." WIS. STAT. § 51.20(1)(a)2.b.

[4] The "fifth standard," which is more complex than the others, provides in relevant part: "For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions." WIS. STAT. § 51.20(1)(a)2.e.

¶5     The County retained two medical professionals, Dr. Marshall Bales and Dr. John Coates, to examine D.J. in preparation for trial. Both doctors submitted reports recommending involuntary commitment, and the reports were provided to D.J. eight days before trial. Both doctors agreed that D.J. was "dangerous," although they appeared to disagree on which of the statutory standards of dangerousness applied to D.J. Dr. Bales concluded that D.J. qualified under the first and second standards, and Dr. Coates concluded that D.J. qualified under the second and fifth standards. Both doctors testified at trial, and their expert reports were received into evidence. The contents of their testimony and reports are discussed at greater length as needed in the discussion section below.

¶6     The circuit court prepared proposed jury instructions, which included instructions on the first, second, and fifth standards. The court gave the parties an opportunity to review and object to the proposed jury instructions, and neither party objected. The jury returned a special verdict finding that D.J. was mentally ill, dangerous, and a proper subject for treatment. The court entered an order imposing a six-month involuntary commitment and banning D.J. from possessing firearms.

## DISCUSSION

¶7     D.J. raises two issues in this appeal. He argues that his procedural due process rights were violated, and also that the evidence presented at trial was insufficient to support the jury's finding that he was "dangerous." I address each argument in turn.

## I.  Procedural Due Process

¶8      I first describe D.J.'s due process argument, and then explain why I decline to address it based on D.J.'s failure to preserve it in the circuit court.

¶9      In *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972),[5] the court concluded that the then-current version of Wisconsin's involuntary commitment statute failed to provide constitutionally adequate process.  The court held that an individual must receive notice of involuntary commitment proceedings "sufficiently in advance of the scheduled court proceedings so that reasonable opportunity to prepare will be afforded," and this notice must inform the individual of, among other things, "the standard upon which he may be detained." *Id.* at 1092.  Following *Lessard*, the Wisconsin legislature significantly modified the laws governing mental health, and enacted new emergency detention and involuntary commitment statutes, WIS. STAT. § 51.15 and WIS. STAT. § 51.20. *See* 1975 Wis. Act 430.

¶10      Based on the facts described above, D.J. argues that the County did not consistently identify the dangerousness standards it believed were satisfied by his conduct.  D.J. contends that by inconsistently stating the dangerousness standards under which it was proceeding, the County failed to satisfy *Lessard*'s mandate that D.J. be given notice of "the standard upon which he may be detained" sufficient to allow him a "reasonable opportunity to prepare" for the commitment hearing. *See Lessard*, 349 F. Supp. at 1092.

---

[5] *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972), was twice vacated by the United States Supreme Court, 414 U.S. 473 (1974); 421 U.S. 957 (1975), but the 1972 opinion was ultimately reinstated, 413 F. Supp. 1318 (E.D. Wis. 1976).

¶11     As D.J. acknowledges, he did not raise any due process objection when his case was pending before the circuit court, nor did he object to the court's proposed jury instructions, which included instructions on the first, second, and fifth standards of dangerousness. Generally, an issue is forfeited if it is raised for the first time on appeal. *State ex rel. Anderson-El v. Cooke*, 2000 WI 40, ¶29, 234 Wis. 2d 626, 610 N.W.2d 821. The forfeiture rule is "a rule of judicial administration" and appellate courts have authority to address the merits of an unpreserved issue in exceptional cases. *Id.* For the following reasons, I conclude that D.J. has not shown it to be in the "best interests of justice" to address his due process argument despite his failure to raise it before the circuit court. *See L.K. v. B.B.*, 113 Wis. 2d 429, 448, 335 N.W.2d 846 (1983).

¶12     First, D.J.'s assertion that he was deprived of a reasonable opportunity to prepare for the commitment hearing is conclusory, and D.J. does not identify any facts that would support such a conclusion. He contends that he was put in a "procedurally impossible position," but does not describe any procedural impossibility that he actually faced. He argues that the differing dangerousness standards require "widely varying strategies for trial preparation," but he does not identify any pretrial investigation he could have done, any trial strategy he could have employed, or any defense he could have made but for the County's method of proceeding. *Cf. id.* (it may be appropriate to disregard a forfeiture "if there are no factual issues that need resolution").

¶13     Second, D.J. does not address whether the expert reports, which he received eight days before trial, provided sufficient notice to satisfy due process. Those reports provided express notification of all of the facts upon which the County proceeded at trial, as well as the three standards of dangerousness that the jury was ultimately instructed about. Rather than offering any argument that the

reports were insufficient to satisfy due process, D.J. ignores this issue. *Cf. State v. Whitrock*, 161 Wis. 2d 960, 970, 468 N.W.2d 696 (1991) (forfeiture may be overcome when the issue is "fully brief[ed]").

¶14  Because I conclude that D.J.'s due process argument is forfeited, I do not address whether or when the County was required to specify the dangerousness standard it intended to rely on at trial, or whether the County's conduct violated D.J.'s procedural due process rights.[6]

## II.  Sufficiency of the Evidence

¶15  D.J. also contends that the evidence presented at trial was insufficient to support the jury's finding that he was "dangerous" as defined in Wisconsin's involuntary commitment statute.[7]  When addressing a challenge to the sufficiency of evidence to support a jury verdict, a reviewing court must sustain the verdict unless it concludes that there is no credible evidence to support it. *Outagamie County v. Michael H.*, 2014 WI 127, ¶21, 359 Wis. 2d 272, 856 N.W.2d 603.  The court views the evidence "in the light most favorable to the verdict." *Id.*  The sufficiency of evidence is a question of law. *Id.*

---

[6] In his briefing, D.J. asks me to convert this appeal to a three-judge panel.  He contends that his due process argument presents an issue of "substantial and continuing public interest" making this opinion suitable for publication under WIS. STAT. RULE 809.23(l)(a)5.  This request for a three-judge panel comes too late, *see* WIS. STAT. RULE 809.41(1), and further, conversion would not be appropriate because I conclude that the due process argument is forfeited.

[7] The County argues that D.J. forfeited his sufficiency argument by failing to raise it before the circuit court, but this argument is unfounded.  The issue of sufficiency may be raised for the first time in an appeal from a commitment order. *See* WIS. STAT. § 51.20 (appeals from a commitment order are governed by WIS. STAT. RULE 809.30); RULE 809.30(2)(h) (sufficiency may be raised for the first time on appeal).

7

¶16    As noted above, dangerousness may be shown by any of five standards listed in WIS. STAT. § 51.20(1)(a)2., and the jury was instructed on three of the standards in this case.  Given the nature of the arguments of the parties, I only address the sufficiency of the evidence under the second standard.[8]

¶17    The second standard requires proof that the individual "[e]vidences a substantial probability of physical harm to other individuals," and it may be shown by evidence of recent "violent behavior" or evidence that "others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." WIS. STAT. § 51.20(1)(a)2.b.

¶18    The County presented evidence that D.J. made threatening statements to staff and constructed makeshift weapons, both at Gunderson and Winnebago.  Dr. Coates testified that on the date of his altercation with Gunderson clinic staff, D.J. "was verbally threatening … all while posturing at staff, and angry."  Dr. Coates also testified that D.J. had built a "makeshift weapon" by stuffing his pants with "wet Kleenexes, socks, and bedding," and that he had apparently been "trying to make a weapon out of whatever he had."  And according to Dr. Bales' report, after his transfer to Winnebago, D.J. "made makeshift weapons, forming a club" and told Winnebago staff that he would "fuck [their] shit up."  The report further states that D.J. threatened to "break[] a staff member in half" and told the staff member that was not a threat but "a promise."

---

[8] The County does not develop any argument that the evidence at trial was sufficient to satisfy the first or fifth standards.  For purposes of this appeal, I presume the County concedes that the evidence was insufficient to support the verdict under the first or fifth standards. *See* *United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (party's failure to respond to an argument may be taken as a concession).

The report notes that there had been "many similar incidents," and Dr. Coates similarly testified that D.J.'s threats against staff were "ongoing."

¶19    The County also presented evidence that D.J.'s threats of violence were not limited to clinic staff.  Dr. Coates testified that D.J. "was repeatedly talking about wanting to harm or injure his family … and put them in the hospital."    According to Dr. Coates' testimony and Dr. Bales' report, D.J. threatened to kill "murderers and rapists" and assassinate Donald Trump.

¶20    Finally, the County presented evidence that D.J. exhibited violent behavior.  Dr. Bales' report states that D.J. "broke a door" while at the Winnebago clinic.

¶21    D.J.'s threats of physical violence against hospital staff and his family, considered in tandem with his continued attempts to make weapons, support a reasonable inference that these threats could reasonably put others in fear of "serious physical harm."  *See Michael H.*, 359 Wis. 2d 272, ¶21 (we draw all reasonable inferences to support a jury's verdict).  Additionally, evidence that D.J. broke a door at the clinic supports a reasonable inference that D.J. exhibited recent violent behavior.  Viewing the record evidence in the light most favorable to the verdict, there is credible evidence to support a finding that D.J. was "dangerous" under the second standard.

¶22    D.J. makes several arguments against the sufficiency of the evidence, but I conclude that these arguments are unavailing.  First, D.J. argues that nothing in the record shows that he has ever in fact harmed anyone.  But the statute does not require *actual* injury to other individuals, only a "substantial probability" of injury.  WIS. STAT. § 51.20(1)(a)2.b.  Lack of evidence of actual injury to others might be a fact that the jury could consider, but weighing the

evidence is a task left to the jury. *See, e.g.*, **Schneck v. Mutual Serv. Cas. Ins. Co.**, 23 Wis. 2d 649, 653, 128 N.W.2d 50 (1964).

¶23    Second, D.J. argues that he was not a danger to others because he did not "intend" the implements he built in the hospital to be used as weapons. But intent is not an element of dangerousness, and further, D.J. cites nothing in the record to show that the jury heard evidence regarding his intent.

¶24    Third, D.J. argues that he was not a danger to others because any weapons he made from clothing stuffed with tissue paper could not possibly cause "serious physical harm." This argument misstates the record. The jury received evidence not only that D.J. made a weapon from clothing and tissue paper, but also that he built a "makeshift club" while at Winnebago. And even assuming the weapons D.J. made could not have caused "serious physical harm," the jury heard testimony that D.J. was attempting to make weapons with "whatever he had." This reasonably supports an inference that, if given the opportunity, D.J. might have made a more dangerous weapon to carry out his threats of violence.

¶25    Fourth, D.J. argues that he was not a danger to others because he had "no way to follow through on any of these threats." He notes that doctors questioned whether he would be able to carry out his plan to assassinate Donald Trump, but D.J. fails to explain how doubt about his ability to assassinate the President also calls into question his ability to harm his family or clinic staff. D.J. reasons that his family members "cannot be placed in 'reasonable fear of violent behavior' by someone who is immobilized in a four-point restraint on a board while incarcerated in a lock-down inpatient facility," but the fact that D.J.'s commitment would prevent him from harming his family is no reason to believe he would pose no danger to them or to others if released.

¶26 Fifth, D.J. argues that although he did "yell at" clinic staff, yelling alone cannot support a finding of dangerousness. He cites an unpublished case, **_Chippewa County v. M.M._**, 2018 WI App 39, 382 Wis. 2d 832, 917 N.W.2d 234, for this proposition. The **_M.M._** opinion is inapt because, as discussed in detail above, the jury received evidence that D.J. did not merely "yell at" clinic staff, but threatened violence, made weapons, and damaged property.

¶27 Finally, D.J. argues that if he _had_ assaulted hospital staff, it would not have been a "dangerous act" but instead "a sad, non-dangerous response to his mistreatment at the hands of those charged with his mental health care." Setting aside all other problems with this argument, it fails because no evidence of this purported "mistreatment" was presented to the jury.[9] In a challenge to the sufficiency of the evidence, the question is whether the evidence _presented at trial_ was sufficient to support the verdict. A sufficiency of the evidence argument is not a proper vehicle for raising a new defense theory that was not made at trial. _See **Best Price Plumbing, Inc. v. Erie Ins. Exch.**_, 2012 WI 44, ¶23, 340 Wis. 2d 307, 814 N.W.2d 419.

_By the Court._—Order affirmed.

This opinion will not be published. _See_ WIS. STAT. RULE 809.23(1)(b)4.

---

[9] D.J. appears to allege that he was mistreated because he was placed in restraints and because a Gunderson employee "mocked and provoked him." The jury did hear testimony that D.J. was placed in restraints while speaking to Dr. Coates, but did not hear any evidence to suggest that these restraints constituted mistreatment or were in any way contrary to medical protocol. The jury heard _no_ evidence relating to alleged misconduct by the clinic director.